**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 28, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CSMN INVESTMENTS, LLC, a Colorado
limited liability company; CSMN
OPERATIONS, LLC, a Colorado limited
liability company,

      Plaintiffs - Appellants,

v.

CORDILLERA METROPOLITAN
DISTRICT, a political subdivision of the
State of Colorado; CORDILLERA
PROPERTY OWNERS ASSOCIATION,
INC., a Colorado nonprofit corporation;
DAVID BENTLEY; DAVID DAVIES;
ROBERT EGAN; KITTY GEORGE;
LARRY KYTE; JUDITH G. MCBRIDE;
RACHEL OYS; ED SHRINER; BRUCE
SMATHERS; PATRICK WILHELM;
TOM WILNER,

      Defendants - Appellees.

19-1094

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-02512-RM-GPG)**
_____

Brian J. Connolly (Andrew L.W. Peters, Bill E. Kyriagis, J. Thomas Macdonald, and
Thomas J. Ragonetti with him on the briefs), Otten, Johnson, Robinson, Neff &
Ragonetti, P.C., Denver, Colorado, for Plaintiffs-Appellants.

Debra J. Oppenheimer (Jeffrey B. Smith with her on the brief), of Altitude Community
Law P.C., Lakewood, Colorado, for Defendant-Appellees, Larry Kyte, Bruce Smathers,
Patrick Wilhelm, and Tom Wilner.

Lisa F. Mickley and Gillian Dale of Hall & Evans, L.L.C., Denver, Colorado (Miles L. Buckingham and Ronald H. Nemirow, Nemirow Perez, Lakewood, Colorado with them on the brief), for Defendants-Appellees, Cordillera Metropolitan District, Cordillera Property Owners Association, David Bentley, David Davies, Robert Egan, Kitty George, Judith G. McBride, Rachel Oys, and Ed Shriner.

_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

The First Amendment guarantees the people a right "to petition the Government for a redress of grievances." The right immunizes litigants from liability for their petitioning activities, unless the petitioning is a sham. In this appeal, we consider the exception for sham petitioning. Applying the *Noerr-Pennington* doctrine, the district court concluded that Appellees' petitioning was entitled to immunity because it was objectively reasonable and, thus, not a sham. We agree that Appellees are immune. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's dismissal of this case.

## BACKGROUND

Nestled in the Rocky Mountains of Eagle County, Colorado is the residential community of Cordillera, which features a private lodge and spa (the "Lodge") and a village center (the "Village"). For many years, the Lodge offered its dues-paying members certain amenities, including a golf course and spa. In addition, it offered the public a restaurant and lodge. And the Village offered "open space, tennis courts and hiking paths, which all residents and their guests . . . enjoy[ed]." App. vol. 3 at 601.

2

But in 2013, after years of monetary losses, the owner of both parcels, Behringer Harvard Cordillera, LLC (BHC), listed them for sale. In 2016, CSMN Investments, LLC (CSMN) contracted with BHC to purchase both properties. CSMN planned to open a private addiction-treatment center—its plan would close the properties to other uses. Patients would stay in the Lodge while receiving treatment at nearby facilities located on both the Lodge and Village parcels. The treatment center would serve people with conditions ranging from eating disorders to chemical dependency.

Before closing on the sale, CSMN sought confirmation from Eagle County's Planning Director (the "Director") that its planned use—operating an *inpatient* addiction-treatment center—was an allowed use under the "Cordillera Subdivision Eleventh Amended and Restated Planned Unit Development Control Document" (PUD). App. vol. 1 at 155. Most recently amended in December 2009, the PUD "sets forth the land uses and development standards for all properties of Cordillera." App. vol. 3 at 457. For the Lodge and Village, the PUD lists thirty-four uses-by-right, including a "Clubhouse and Lodge"; "Professional Offices"; "Lodging and Accommodations"; various residential uses; and "Medical Offices/Facilities, limited to clinic and *outpatient* facilities for non-critical care, including, without limitation, for outpatient plastic surgery and other cosmetic procedures." App. vol. 3 at 467–68 (Lodge), 473–74 (Village) (emphasis added).

3

On June 1, 2016,[1] the Director issued his written interpretation of the PUD, concluding that CSMN could operate "a clinic including *inpatient*, non-critical care, for treatment of a variety of conditions including, but not limited to, eating disorders, alcoholism, chemical dependency, and behavioral health conditions with a focus on health and fitness, including fitness facilities, yoga, nutrition and recreation." App. vol. 1 at 155 (emphasis added). He based his interpretation on the PUD's approved use for "Medical Offices/Facilities, limited to clinic and outpatient facilities for non-critical care, including, without limitation, for outpatient plastic surgery and other cosmetic procedures." *Id.* (emphasis omitted). He concluded that CSMN's use fit this description because it excluded critical care and required treatment in a clinical setting. Further, he concluded that an addiction-treatment center qualified because the PUD allowed clinical care "without limitation," notwithstanding its specific reference to "plastic surgery and other cosmetic procedures." *Id.* (emphasis omitted).

## I.     Challenging the Director's Interpretation

In response to the Director's interpretation, community members expressed dismay and outrage at the opening of an addiction-treatment center[2] in Cordillera and the closure of the Lodge and Village parcels to the public. Illustrative of the local sentiment, one community member labeled CSMN's plans a "[c]atastrophe for the

---

[1] To correct a procedural issue, this interpretation was re-issued on July 1, 2016.

[2] The CSMN addiction-treatment center was high-scale, with planned monthly patient charges of $60,000.

4

community[,]" believing the center's opening "should be stopped at all costs," while another labeled "[t]he presence of such a facility in our community . . . poisonous to the essential values of the community by introducing a population destructive to our neighborhood's peace of mind, real estate values, and carefully cultivated reputation." App. vol. 3 at 566, 581. Other members voiced concern for the safety of their children and grandchildren: "I . . . don't feel comfortable with the idea of my grandchildren playing outside or hiking in the neighborhood where persons with addictions could be as well as 'dealers' who might be trying to reach the 'patients' inside!" *Id.* at 587. Yet others, who were club members at the Lodge, were "devastated" by the sale, because the Lodge was the main reason that they moved to Cordillera in the first place. *Id.* at 584. They could not believe that it would now be closed to paying community members.

In view of the overwhelming community response, Cordillera Property Owners Association (CPOA) and Cordillera Metropolitan District (CMD) jointly appealed the Director's PUD interpretation to the Board of County Commissioners (the "Board").[3] To assist in this appeal, CMD created the Legal Committee, which was comprised of Larry Kyte, Ed Shriner, Bruce Smathers, Patrick Wilhelm, and Tom Wilner. The appeal raised four challenges to the Director's interpretation: (1) allowing a use inconsistent with the PUD's purpose of serving a resort, residential community;

---

[3] CMD is a local-government entity providing services to the Cordillera community and is governed by a board of directors. The CPOA is the property owners' association for the community.

(2) failing to "give effect to the legislative intent governing the use of the [Lodge and Village] requiring [the parcels] to be used as a focal point and social gathering place for the residents and guests of Cordillera"; (3) failing "to apply the actual language of the PUD which would preclude inpatient treatment and the proposed uses are something other than a clinic"; and (4) allowing a use of the Lodge and Village so far beyond what PUD allows as to amount to a "wrongful Major Modification," which would require "approval" from the CPOA "and formal amendment to the PUD." App. vol. 3 at 594.

After a hearing, the Board affirmed the Director's interpretation on all but one point. Addressing CMD and CPOA's third basis for appeal, the Board reversed the Director's interpretation that CSMN could use the property as an *inpatient*-treatment center, concluding that the PUD permitted only outpatient clinical uses. So in a modified interpretation, the Board required that CSMN's "clinic component be operated as an outpatient facility[,]" not inpatient, as CSMN had proposed. *Id.* at 598.

On November 8, 2016, CMD and CPOA took their case to Colorado state court, seeking review of the Board's ruling under Colorado Rule of Civil Procedure 106(a)(4).[4] The Colorado state district court affirmed the Board's decision. Though CMD did not appeal, CPOA did, and on November 29, 2018, the Colorado Court of

---

[4] This rule allows for the Colorado district court to review whether "any governmental body . . . exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, . . . based on the evidence in the record before the defendant body . . . ." Colo. R. Civ. P. 106(a)(4).

6

Appeals affirmed the Board and the district court in an unpublished decision.[5] *See*

*Benson v. Eagle County*, No. 17CA1973, 2018 WL 6241502 (Colo. App. Nov. 29,

2018). And on August 19, 2019, the Colorado Supreme Court denied certiorari. *See*

*Benson v. Eagle County*, No. 18SC893, 2019 WL 3934442 (Colo. Aug. 19, 2019).

**II.     Civil Rights Actions Against CPOA, CMD, and Associated Individuals**

On December 28, 2017, with the state-court appeals pending, CSMN turned

the tables, filing a civil-rights action in Colorado federal district court against CPOA,

CMD, and various associated people—the CMD board members, the CMD district

manager, and the Legal Committee members. CSMN's complaint contains three

claims, each against a different subset of defendants.

First, CSMN alleges that CMD violated the Americans with Disabilities Act

(ADA).[6] It asserts that the ADA protects both CSMN's future clients—drug- and

alcohol-addicted people—and CSMN (as a "service provider" to those individuals).

App. vol. 2 at 446. By this view, CMD's legal actions restricted CSMN's "use of the

Property . . . due to [CSMN's] efforts to provide residential services to persons with

disabilities," so CMD had engaged in "intentional discrimination against CSMN and

its future clients[,] in violation of Title II of the ADA[.]" *Id.* Second, CSMN alleges

---

[5] The state district court consolidated CMD and CPOA's case with a similar case brought by Cordillera homeowners.

[6] CSMN limited its claim to CMD, the only defendant that qualifies as a public entity under 42 U.S.C. § 12131(1) (defining "public entity" under the ADA to include "any . . . special purpose district, or other instrumentality of a State or States or local government").

7

that all Appellees violated the Fair Housing Act (FHA) by seeking to prevent CSMN's future clients from residing at the property (which CSMN calls a "dwelling" under the FHA) due to their disabilities. *Id.* at 447. CSMN alleges that Appellees accomplished this by pursuing a PUD interpretation that would have prevented CSMN from providing housing to disabled people. And third, CSMN brings a 42 U.S.C. § 1983 action against CMD, David Bentley, David Davies, Robert Egan, Kitty George, Larry Kyte, Judith McBride, Rachel Oys, Ed Shriner, Bruce Smathers, Patrick Wilhelm, and Tom Wilner (only CPOA is excluded). The claim alleges that "[u]nder color of state law," those Appellees "injured CSMN by conspiring to deprive, failing to stop the deprivation, or depriving CSMN and its future Clients of equal protection . . . and due process . . . under the First and Fourteenth Amendments . . . , and as guaranteed under the ADA[.]" *Id.* at 448.

In response, Appellees moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims, arguing that the right to petition immunized their conduct. CSMN countered that Appellees' claim of immunity was unfounded because the petitioning had sought an unlawful outcome, and that even if the immunity somehow did apply, the petitioning fell within an exception to that immunity, that is, the petitioning was a "sham." The district court sided with Appellees, dismissing all but

8

one[7] of the claims on the ground that their conduct was protected by *Noerr-Pennington* immunity—based on the First Amendment's right to petition—and that no exception to the immunity applied. CSMN timely appealed.

## DISCUSSION

The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.[8] The Supreme Court has "recognized this right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights,' and . . . explained that the right is implied by '[t]he very idea of a government, republican in form[.]'" *BE & K Constr. Co. v.*

---

[7] The district court thought that all claims involved petitioning for a redress of grievances, except the one for "FHA Retaliation." App. vol. 3 at 761. Under that claim, CSMN argued that Appellees had "encourag[ed] community sentiment and action" against CSMN's plans. *Id.* (internal quotation marks and citation omitted). The district court dismissed it for failure to state a claim. CSMN has failed to challenge this dismissal in its opening brief, so we do not consider it. *See* Opening Br. 40 ("In light of the fact that this case presents a question of first impression with respect to *the only issue presented for review*, . . . CSMN respectfully requests oral argument." (emphasis added)). "An appellant's opening brief must identify 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'" *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (quoting Fed. R. App. P. 28(a)(9)(A)). "[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." *Id.* "Scattered statements in the appellant's brief are not enough to preserve an issue for appeal." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1133 n.4 (10th Cir. 2004) (citing *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994)).

[8] Because the First Amendment applies to state and local governments through the Fourteenth Amendment, the petition clause "applies fully to municipal activities." *New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *see also City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 384 (1991) (applying *Noerr-Pennington* immunity to municipal activities).

*NLRB*, 536 U.S. 516, 524–25 (2002) (first alteration in original) (citation omitted) (first quoting *United Mine Workers of Am., Dist. 12 v. Ill. Bar Ass'n*, 389 U.S. 217, 222 (1967); and then quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1875)). Immunity flows from this right, protecting those who seek redress through the courts from liability for petitioning activities. *See, e.g.*, *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("[T]he right to petition extends to all departments of the Government[, and] [t]he right of access to the courts is . . . but one aspect of the right of petition." (citations omitted)).

The contours of this immunity developed in a line of antitrust cases, giving rise to the moniker, *Noerr-Pennington* immunity. *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *see also Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (holding litigants immune from an antitrust claim under *Noerr-Pennington* immunity). In *Noerr*, for example, the Supreme Court considered whether a complainant could "base a Sherman Act conspiracy [claim] on evidence consisting entirely of activities of competitors seeking to influence public officials." *Pennington*, 381 U.S. at 669 (discussing *Noerr*, 365 U.S. at 140). The Court said it could not, holding in light of the Petition Clause that "the Sherman Act does not prohibit . . . persons from associating . . . in an attempt to persuade the [government] to take particular action with respect to a law that would produce a restraint or a monopoly." *BE & K*, 536 U.S. at 525 (omissions in original) (internal quotation marks omitted) (quoting *Noerr*, 365 U.S. at 136).

10

But the Court recognized that this broad immunity could shield litigants to use the courts to harass enemies with impunity. With this concern in mind, the Supreme Court carved out an exception, disallowing immunity for "sham" petitioning:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a *mere sham* to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

*Noerr*, 365 U.S. at 144 (emphasis added). Thus, under the *Noerr-Pennington* "line of cases . . . genuine petitioning is immune from antitrust liability, [but] sham petitioning is not." *BE & K*, 536 U.S. at 525–26 (discussing *Noerr*, 365 U.S. at 144).

In determining what constitutes "sham petitioning" under *Noerr-Pennington*, the Supreme Court has adopted a two-step test. *See Prof'l Real Estate*, 508 U.S. at 60–61. Under the first step, a court considers whether the petitioning has an objectively reasonable basis. *Id.* at 60. If so, immunity applies. *Id.* But if not, a court proceeds to the second step, considering the subjective motivation behind the petitioning. *See id.* at 57 ("We . . . hold that an objectively reasonable effort to litigate cannot be sham regardless of subjective intent."). Put another way, under *Professional Real Estate*'s sham-petitioning test, subjective intent matters only if the petitioning activity lacks objective reasonableness.

In this circuit, this immunity extends beyond antitrust situations. *See Cardtoons*, *L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000) (en banc) ("[W]e do not question the application of the right to petition outside of antitrust . . . ."). But we refer to it as Petition Clause immunity, reserving

11

the name, *Noerr-Pennington*, for antitrust cases. *See id.* at 889–90 ("In our view, it is more appropriate to refer to immunity as *Noerr-Pennington* immunity only when applied to antitrust claims. In all other contexts, . . . such immunity derives from the [Petition Clause]." (footnote omitted)). This circuit has not yet had occasion to determine the scope of that immunity. In particular, we have not yet considered the applicability of *Professional Real Estate*'s two-step test beyond antitrust.

CSMN argues that we need not reach this question because the Petition Clause does not apply when the petitioning party seeks an "unlawful objective." Opening Br. 21 (capitalization removed). Appellees counter that we should apply *Professional Real Estate* to sustain the district court's dismissal. We agree with Appellees, and as later explained, we decline CSMN's invitation to create an unlawful-objective exception to Petition Clause immunity.

Below, we first analyze whether *Professional Real Estate* is the proper sham-petitioning test for the conduct at issue here and conclude that it is. We then apply it to Appellees' petitioning, concluding it was objectively reasonable. We wrap up by explaining our rejection of an unlawful-objective exception to Petition Clause immunity.

I.      **Sham-Petitioning Exception**

In determining the proper sham-petitioning test, *Professional Real Estate* provides a two-step approach: (1) is the petitioning objectively reasonable? (2) and only if not, what is the subjective intent behind the petitioning? CSMN offers an

12

alternative approach, which looks solely to the subjective intent behind the petitioning when determining whether it constitutes a sham.

We adopt *Professional Real Estate* here, meaning we must resolve whether the district court erred in finding Appellees' petitioning objectively reasonable. Concluding that the petitioning was objectively reasonable, we affirm the district court.

### A.     The Proper Test

Because it presents a question of constitutional law, we review de novo the proper test for determining what constitutes sham petitioning. *See, e.g.*, *Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1160 (10th Cir. 2004). CSMN contends that Petition Clause immunity is improper for objectively reasonable "lawsuits that are unsuccessful and filed with the subjective purpose of interfering with legally-protected rights or imposing litigation costs regardless of the outcome." Opening Br. 26 (citing *Cardtoons*, 208 F.3d at 889 n.4; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 742–43 (1983); *BE & K*, 536 U.S. at 532; *id.* at 538 (Breyer, J., concurring)). Because these three cases form the basis of CSMN's argument, we begin there.

In *Bill Johnson's*, the Supreme Court considered whether the National Labor Relations Board (NLRB) could enjoin a state-court proceeding "brought by an employer to retaliate against employees for exercising federally-protected labor rights, without also finding that the suit lacks a reasonable basis in fact or law." 461 U.S. at 733. In resolving this issue, the Court held that the NLRB "may not halt the

prosecution of a state-court lawsuit, regardless of the plaintiff's motive, unless the suit lacks a reasonable basis in fact or law." *Id.* at 748. But the Court also commented—even though the issue was not before it—that if the plaintiff lost the suit, the NLRB could consider the suit's "retaliatory intent" and order relief. *Id.* at 748–49.

And because unsuccessful suits can still have been objectively reasonable, this *Bill Johnson's* dicta contemplates liability even for objectively reasonable suits if brought with an improper purpose. In *Cardtoons*, we noted, in dicta,[9] the tension between this result and the result later prescribed by *Professional Real Estate*— subjective motivation matters only if the petitioning is objectively unreasonable. *See Cardtoons*, 208 F.3d at 889 n.4. Given this tension, we offered this way of reconciling the two cases:

> The only way to reconcile [*Professional Real Estate* and *Bill Johnson's*] is to limit them to the contexts in which they arose. [*Professional Real Estate*] is an antitrust case; *Bill Johnson's* is not. . . . [Thus, *Professional Real Estate*] must be limited to the antitrust context. Outside of that context, the Petition Clause protects objectively reasonable lawsuits from being enjoined, but requires a court to look at the underlying statute to determine whether the initiator of the suit can be held liable.

---

[9] "Dicta are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand." *Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1129 (10th Cir. 2009) (citation and internal quotation marks omitted). In *Cardtoons*, the issue before the court was whether Petition Clause immunity applies to "purely private threats" "of litigation between purely private parties in a non-antitrust setting." 208 F.3d at 886. The sham exception was not at issue.

14

*Id.* Thus, the *Cardtoons* dicta favors the *Bill Johnson's* dicta over *Professional Real Estate* for determining what constitutes sham petitioning for all non-antitrust contexts.

But two years after *Cardtoons*, the Supreme Court decided *BE & K*, which undercut the basis on which the *Cardtoons* dicta rested. First, in *BE & K*, the Supreme Court identified the *Bill Johnson's* language as dicta (the language relied on in *Cardtoons* to differentiate between what was required to show that petitioning was a sham in antitrust cases versus all other case types). *See BE & K*, 536 U.S. at 527–28 (explaining that *Bill Johnson's* concerned whether the NLRB could enjoin an ongoing suit without finding that it was reasonably based, meaning the Court "had no actual need to decide whether the [NLRB] could declare unlawful reasonably based suits that were ultimately unsuccessful"). And in *BE & K*, the Supreme Court rejected the *Bill Johnson's* dicta, choosing to "exercis[e] [its] 'customary refusal to be bound by dicta.'" *Id.* at 528 (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994)). Thus, though we take special heed of dicta from our en banc decisions, the Supreme Court's later words steer us elsewhere here.

In addition to rejecting the *Bill Johnson's* dicta, *BE & K* provided three reasons for why it would be desirable for the Petition Clause to immunize unsuccessful but reasonably based lawsuits.[10] First, the Court noted that refusing immunity simply

---

[10] *BE & K* concluded that by imposing liability on "all reasonably based but unsuccessful suits filed with a retaliatory purpose," the NLRB ran afoul of the National Labor Relations Act (NLRA) by ensnaring "petitioning that is objectively and subjectively genuine." 536 U.S. at 534–36. But because the issue was

15

because the petitioning ultimately fails would ignore that "the genuineness of a grievance does not turn on whether it succeeds." 536 U.S. at 532. Given this, Supreme Court doctrine has "protected petitioning whenever it is genuine, not simply when it triumphs." *Id.* (citing *Prof'l Real Estate*, 508 U.S. at 58–61; *Pennington*, 381 U.S. at 670). In fact, the framers recognized this in the First Amendment's text: "[T]he text of the First Amendment [does not] speak in terms of successful petitioning—it speaks simply of 'the right of the people . . . to petition the Government for a redress of grievances.'" *Id.* (omission in original) (quoting U.S. Const. amend. I). Thus, we see, in both the Petition Clause's text and in Supreme Court cases, a preference for immunizing unsuccessful, reasonably based petitioning.

Second, good reasons support this preference because "even unsuccessful but reasonably based suits advance some First Amendment interests." *Id.* For example, extending First Amendment protection to such suits allows for "the public airing of disputed facts" and "rais[ing] matters of public concern." *Id.* (internal quotation marks and citation omitted). This allows parties to "promote the evolution of the law by supporting the development of legal theories that may not gain acceptance the first time around." *Id.* "Moreover, the ability to lawfully prosecute even unsuccessful suits

---

unpresented, the Court "d[id] not decide whether the [NLRB] may declare unlawful any unsuccessful but reasonably based suits that would not have been filed but for a motive to impose the costs of the litigation process, regardless of the outcome, in retaliation for NLRA protected activity[.]" *Id.* at 536–37. But a concurring opinion argued that the effect of the decision was to impose the *Professional Real Estate* test on NLRA cases. *See id.* at 537 (Scalia, J., concurring). We agree with Justice Scalia's statement and conclude that *BE & K* supersedes anything to the contrary in *Cardtoons*.

16

adds legitimacy to the court system as a designated alternative to force." *Id.* Again, these reasons weigh heavily in favor of broad immunity for petitioning activities, so long as the petitioning has a legitimate basis in the law.

Third, the Court recognized that some speech is unprotected, including false statements. *Id.* And though baseless suits are "analogous to false statements," reasonably based, unsuccessful suits are not. *Id.* "For even if a suit could be seen as a kind of provable statement, the fact that it loses does not mean it is false." *Id.* at 532–33.

These considerations weigh heavily in favor of protecting objectively reasonable petitioning. And these interests still exist when petitioning may have been brought with improper motives, provided it was commenced with an objectively reasonable basis. Asking courts to divine the subjective mindset motivating a lawsuit is a big ask. Litigants may have mixed reasons for suing, some proper, others not. Thus, without looking to objective reasonableness first, courts may need to balance improper motives against proper ones. Doing so would be difficult, requiring courts to peer inside the petitioning parties' minds to make a judgment about their intentions. If the petitioning is objectively reasonable, a court risks chilling legitimate litigation by withholding immunity for parties with legitimate grievances.[11]

---

[11] We recognize valid concerns over whether reasonably based petitioning could be so abusive as to be a sham and discuss that *infra* regarding *California Motors*'s test for sham petitioning.

17

These interests do not weigh as heavily in favor of immunity if the petitioning is objectively unreasonable. After all, such unreasonableness might evince improper motivation. Parties with legitimate grievances can realistically expect some success. Absent that, courts can reasonably question whether the subjective intent is to harass, discriminate, or interfere with legally protected rights. The sham-petitioning exception was created to stop this sort of behavior. We agree that CSMN raises a valid concern about courts becoming an avenue for discrimination, but the *Professional Real Estate* test guards against that outcome, by requiring that the petitioning be objectively reasonable.[12] So, for these reasons, we adopt *Professional Real Estate*'s sham-petitioning test for determining whether conduct is a sham, such that it loses Petition Clause immunity.[13]

---

[12] We also recognize that by adopting the *Professional Real Estate* test, immunity may be extended to lawsuits brought to interfere with an opponent's legally protected rights, provided such suits are reasonably based. But the First Amendment often extends its protection to activity we may not like. *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (recognizing First Amendment protection for "ideas that offend"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992) ("The First Amendment does not permit [the government] to impose special prohibitions on those speakers who express views on disfavored subjects." (citations omitted)).

[13] Further, *Professional Real Estate* says that its sham-petitioning test applies outside antitrust situations. 508 U.S. at 59 ("Whether applying *Noerr* as an antitrust doctrine *or invoking it in other contexts*, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." (emphasis added)). And other federal circuit courts have recognized this, adopting *Professional Real Estate*'s test outside of antitrust cases. *See, e.g.*, *Real Estate Bar Ass'n for Mass., Inc. v. Nat'l Real Estate Info. Servs.*, 608 F.3d 110, 124–25 (1st Cir. 2010) (granting Petition Clause immunity from § 1983 litigation to a "nonfrivolous" but unsuccessful suit); *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 691–94 (5th Cir. 2010) (same with various civil-rights suits); *White v. Lee*, 227 F.3d 1214, 1233 (9th Cir. 2000) (same with FHA litigation).

**B.     Applying *Professional Real Estate*'s Sham-Petitioning Test**

We review de novo the district court's decision to grant Appellees' motion to dismiss. *See Albers v. Bd. of Cty. Comm'rs*, 771 F.3d 697, 700 (10th Cir. 2014). On a motion to dismiss, courts "must accept all the well-pleaded allegations of the complaint as true and . . . construe them in the light most favorable to the plaintiff." *Id.* (quoting *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013)) (internal quotation mark omitted). Under this standard, we conclude that Appellees' petitioning was objectively reasonable.

At the outset, we note that Appellees' losing in the Colorado district court and the Colorado Court of Appeals does not make their petitioning objectively unreasonable. As the Court discussed in *BE & K*, Petition Clause immunity applies "whenever [the petitioning] is genuine, not simply when it triumphs." 536 U.S. at 532. So in determining whether Petition Clause immunity applies, we review the merits of the petitioning and, in doing so, look for litigation "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Prof'l Real Estate*, 508 U.S. at 62. We do not find that here.

First, Appellees were partially successful in their appeal to the Board. On review, the Board agreed with Appellees that the PUD restricted CSMN's clinical use to "outpatient," not "inpatient." CSMN tries to mitigate the importance of this ruling by claiming that it had always planned to provide only outpatient treatment and, thus, the Board's limitation was meaningless. Though CSMN's plans identified only outpatient treatment, the fact remains that CSMN sought a PUD interpretation

19

allowing for inpatient treatment. Whether this was on accident or purposeful, had the Board not limited care to outpatient services, CSMN could have operated an inpatient-treatment center in the future. This alone shows that Appellees' petitioning had some merit.

Next, the history of the 2009 PUD amendment supported Appellees' arguments to the Board and Colorado court, showing their arguments were reasonable, though unsuccessful. With the 2009 amendments, Cordillera homeowners tried to clarify that new uses would not substantively change the PUD. So in 2009, when then-owner BHC proposed changing the PUD's language to allow a "Medical Offices/Facility" on the Village and Lodge parcels, CPOA objected that the proposed use was "overbroad." App. vol. 4 at 602. CPOA helped rewrite the provision, resulting in language finally adopted in the 2009 PUD—language that the homeowners believed was consistent with the PUD's earlier-allowed uses. Thus, when CSMN bought the property in 2016 and proposed closing the Lodge and Village parcels to the public and opening an addiction-treatment center, we can understand why the Cordillera homeowners would be surprised. In light of all their input leading to the 2009 PUD, Appellees' arguments that the new PUD interpretation improperly restricted the formerly public Lodge and Village parcels to private use make some sense. And while we agree with the state courts' interpretation of the PUD, we conclude that Appellees' contrary arguments in the Colorado courts were reasonable. The homeowners had a right to be concerned about a change to the properties' uses—especially one that restricted public access to a traditionally-open

20

community amenity—and to press for an interpretation that would preserve public access.

Finally, we consider the state-court rulings in determining whether the suits were objectively reasonable. The state district court opinion is thorough and well-reasoned. Though the court criticized some of Appellees' legal arguments as making "little sense," the court certainly did not deem them frivolous. *Id.* at 610–11. Rather, both the district and appellate courts submitted lengthy opinions containing in-depth analysis, treating Appellees' arguments as time-worthy though ultimately unpersuasive.

In sum, we find that Appellees' appeals of the Director's PUD interpretation were objectively reasonable, meaning the sham exception does not apply. And because the appeals were objectively reasonable,[14] we need not consider *Professional Real Estate*'s second step.

## C.     The *California Motor* Sham Test

CSMN presents an alternative basis for deeming Appellees' petitioning a "sham": it argues that Appellees filed a "series of petitions without regard to merit[s] and for the purpose of harming [CSMN's] legal interest." Opening Br. 31. Under *California Motor*, "a slew of 'state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or register those

---

[14] CSMN argues that it should be allowed further discovery about the objective reasonableness of the appeals. But we can determine the objective reasonableness of the appeals by examining the court filings and court rulings.

21

rights'" constituted a "sham." *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363 (4th Cir. 2013) (quoting *Cal. Motor*, 404 U.S. at 509). Thus, "sham litigation occurs where 'a pattern of baseless, repetitive claims . . . emerge[s] which leads the factfinder to conclude that the administrative and judicial processes have been abused.'" *Id.* (omission and alteration in original) (quoting *Cal. Motor*, 404 U.S. at 513).

We do not find this to be the case here. Appellees appeared before three tribunals: (1) the Board, (2) the Colorado district court, and (3) the Colorado Court of Appeals (CPOA only). Each of these appeals originated from the same case, meaning multiple suits were not brought on the same issue—instead, the Appellees simply appealed. In fact, CMD did not even continue its appeal after losing in state district court. In contrast, the petitioners in *California Motor* repeatedly brought claims in both state and federal courts, trying to prevent competitors from obtaining operating licenses. 404 U.S. at 509. Unlike in that case, Appellees here pursued only a straight line of appeals. Given these considerations, we do not find that Appellees engaged in a series of lawsuits that were intended to abuse judicial processes. And thus, Appellees' conduct does not qualify for the *California Motor* sham exception and Petition Clause immunity applies.

## II. Unlawful-Objective Exception

CSMN asks us to adopt an unlawful-objective exception to Appellees' "entitle[ment] to Petition Clause immunity." Opening Br. 21 (title case removed). Under its proposed exception, Petition Clause immunity would not apply to

22

petitioning seeking an unlawful objective. To support this exception, CSMN relies on a *Bill Johnson's* footnote and two circuit court cases.[15] We decline to extend this test outside the labor-relations context.

As discussed earlier, in *Bill Johnson's*, the Court considered whether the NLRB could enjoin "an [ongoing] employer's lawsuit that the federal law would not bar except for its allegedly retaliatory motivation." 461 U.S. at 737 n.5. The Court concluded that it could not. *Id.* at 743 ("The filing and prosecution of a well-founded lawsuit may not be enjoined . . . even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [NLRA]."). The Court contrasted that situation with another, noting that the NLRB could enjoin a suit seeking "an objective that is illegal under federal law." *Id.* at 737 n.5

Recasting these two situations, we see the following: (1) an employer lawsuit with an improper motive (one that would be legal but for its improper motive), and (2) a lawsuit seeking an illegal objective. Under *Bill Johnson's*, the NLRB could enjoin the second suit but not the first if that suit was objectively reasonable. The

---

[15] One of the cases CSMN cites, *Premier Electrical Construction Co. v. National Electrical Contractors Association, Inc.*, 814 F.2d 358 (7th Cir. 1987), does not apply here. It involved antitrust claims arising from conduct that sought "to use the courts to carry out private cartel agreements." *Id.* at 374. So unlike Appellees here, who merely sought "a favorable rule of law," the petitioners in *Premier Electrical* sought more, because "[t]here is no such thing as the lawful enforcement of a private cartel." *Id.* at 376. Moreover, if *Premier Electrical* were decided today, *Professional Real Estate* would apply to its antitrust claims, with the same result, because a party cannot realistically expect success when asking a court to enforce a private cartel.

23

first situation mirrors *Professional Real Estate*'s sham-petitioning test, while the second situation applies that test to the labor-relations context, announcing a per se rule that petitioning is objectively and subjectively unreasonable if seeking an illegal objective.[16] So in resolving a labor dispute, *Bill Johnson's* used the method that *Professional Real Estate* would adopt ten years later. In fact, *Professional Real Estate* recognized *Bill Johnson's* when it fashioned its two-step sham-petitioning rule.[17] Given these considerations, we limit the application of this per se unlawful-objective rule to the *Bill Johnson's* context, meaning it speaks only to what the NLRB must show to enjoin an ongoing lawsuit.

Further, good reasons counsel against extending this per se rule beyond the labor-relations context. For starters, the rule assumes that a suit seeking an illegal objective is brought with improper motive. This would bypass a review of the

---

[16] In *International Longshoremen's & Warehousemen's Union v. NLRB*, 884 F.2d 1407, 1414 & n.12 (D.C. Cir. 1989), the D.C. Circuit recognized that its conclusion that a union had sought an illegal objective with its petitioning meant that the union's petitioning "*necessarily* had an improper motive" and "*necessarily* lacked a reasonable basis." So even several years before *Professional Real Estate* was decided, courts were recognizing that the unlawful-objective exception contained both an objective and subjective prong.

[17] In *Professional Real Estate*, the Supreme Court partly relied on *Bill Johnson's* in concluding that "[o]ur decisions . . . establish that the legality of objectively reasonable petitioning 'directed toward obtaining governmental action' is 'not at all affected by any anticompetitive purpose [the actor] may have had.'" *Prof'l Real Estate*, 508 U.S. at 59 (omission and second alteration in original) (quoting *Noerr*, 365 U.S. at 140). To reach this conclusion, the Court noticed that *Bill Johnson's* had used an "analogy to *Noerr*'s sham exception . . . [to hold] that even an 'improperly motivated' lawsuit may not be enjoined under the [NLRA] as an unfair labor practice unless such litigation is 'baseless.'" *Id.* (quoting *Bill Johnson's*, 461 U.S. at 743–44).

plaintiffs' subjective motivation, substituting a per se rule that lawsuits seeking an illegal objective are brought with improper intent. But in practice, not all litigation seeking an illegal objective does so.[18]

By adopting an unlawful-objective exception to Petition Clause immunity, we would eliminate immunity even in cases in which the party petitioning for redress does so for benign reasons. We reject that result. Petition Clause immunity exists to promote access to the courts, allowing people to air their grievances to a neutral tribunal. In fact, "the ability to lawfully prosecute even unsuccessful suits adds legitimacy to the court system as a designated alternative to force" and ensures that litigants can argue for "evolution of the law." *BE & K*, 536 U.S. at 532. For instance, litigants might advocate in good faith for changes to laws, outside what is presently allowed. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 3–5 (1967) (seeking to validate a marriage that petitioners recognized was then illegal under settled Virginia law). Applying an unlawful-objective exception in these circumstances could expose those parties to liability. Such a rule could stifle litigation and slow the law's development. We should promote development of the law, even when the result may be unpopular. "It is important to emphasize that a person's speech or petitioning activity is not removed from the ambit of First Amendment protection simply because it advocates an unlawful act." *White v. Lee*, 227 F.3d 1214, 1227 (9th Cir. 2000).

---

[18] We question whether a per se unlawful-objective exception survives *BE & K* even under the NLRA. There, the Court stressed the importance of looking at both objective reasonableness and subjective intent. *BE & K*, 536 U.S. at 526, 528.

With the two-step sham test from *Professional Real Estate*, we strike the appropriate balance between protecting individuals' First Amendment petitioning rights and preventing lawsuits that are used to harass or discriminate against others. Both the subjective and objective components are necessary to protect important First Amendment rights. Adopting a categorical, unlawful-objective exception to the First Amendment's right to petition the government for a redress of grievances would run the risk of imposing liability on individuals who seek to undermine what they consider unjust laws. So for these reasons, we reject adopting a broad unlawful-objective exception to Petition Clause immunity.

## CONCLUSION

For the above reasons, we reject CSMN's proposed unlawful-objective exception to Petition Clause immunity and adopt *Professional Real Estate*'s two-prong test for determining whether the sham exception to Petition Clause immunity applies. Applying that test here, we affirm the district court and hold that Appellees engaged in objectively reasonable litigation, and thus, the Petition Clause immunizes their conduct.