NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

21-P-1135                                        Appeals Court

BRISTOL ASPHALT CO., INC., & another[1] vs. ROCHESTER BITUMINOUS
                    PRODUCTS, INC., & others.[2]


No. 21-P-1135.

Plymouth.     November 2, 2022. - April 28, 2023.

Present:  Rubin, Englander, & Hand, JJ.


"Anti-SLAPP" Statute. Practice, Civil, Motion to dismiss.
     Constitutional Law, Right to petition government. Zoning,
     Site plan approval, Wetlands. Municipal Corporations,
     Conservation commission. Massachusetts Environmental
     Policy Act.



Civil action commenced in the Superior Court Department on
August 17, 2020.

     A special motion to dismiss was heard by Thomas F. McGuire,
Jr., J.


     Michael S. Rabieh for the defendants.
     Brian M. Hurley for the plaintiffs.


_____

     [1] Edgewood Development Company, LLC.

     [2] Albert Todesca and Paul Todesca, individually and as
trustees of the Todesca Realty Trust.

HAND, J.  This case stems from a decade-long battle between the plaintiffs and the defendants over the plaintiffs' efforts to build a bituminous concrete plant on property in the town of Rochester's (town or Rochester) industrial zoning district.  The proposed plant was to be developed adjacent to an existing concrete plant operated by the defendants in the same district.

Beginning in 2010 and continuing through 2020, the defendants opposed the plaintiffs' plans before local and State boards and administrative agencies and sought judicial review of the adverse decisions of those bodies in the trial court and in the Appeals Court.  The plaintiffs prevailed before every tribunal at every level.  The plaintiffs contend that the defendants' petitioning was merely an improper attempt to prevent business competition.  Accordingly, in August 2020, after the dust from the defendants' petitioning efforts had settled, the plaintiffs filed suit against the defendants in the Superior Court.  In their amended complaint they alleged violations of G. L. c. 93A, § 11 (count I), G. L. c. 93, § 4 (count II), and abuse of process (count III).  The defendants responded that the plaintiffs' action was an improper attempt to chill their rights to engage in legitimate petitioning activity, and filed a special motion to dismiss the plaintiffs' claims

under the "anti-SLAPP"[3] statute, G. L. c. 231, § 59H.  Applying

the augmented burden-shifting framework set forth in Blanchard

v. Steward Carney Hosp., Inc., 477 Mass. 141, 159-160 (2017)

(Blanchard I), S.C., 483 Mass. 200 (2019) (Blanchard II),

modifying Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156

(1998) (Duracraft), the judge concluded that the defendants, as

the moving parties, made the required threshold showing that the

complaint was based solely on their petitioning activity.  He

also concluded, however, that the plaintiffs ultimately met the

"high bar" required to defeat the motion by demonstrating that

the defendants' petitioning activity lacked any reasonable basis

in fact or law.  See Blanchard II, supra at 204.  Accordingly,

the judge denied the defendants' special motion to dismiss.[4]  The

defendants appealed that ruling under the doctrine of present

execution.  See id. at 213 (doctrine of present execution

applies to interlocutory order denying anti-SLAPP motion);

---

[3] "SLAPP" is an acronym for "Strategic Lawsuit Against
Public Participation."  Duracraft Corp. v. Holmes Prods. Corp.,
427 Mass. 156, 160 n.7 (1998).

[4] The defendants' special motion to dismiss included a
motion, in the alternative, for judgment on the pleadings.  The
judge allowed that motion as to so much of count III as alleged
abuse of process based on administrative proceedings, and
otherwise denied it.  As far as we are aware, no separate
judgment has entered as to that aspect of the plaintiffs' claim.
In any event, the ruling is not part of the instant appeal, and
we do not address it further.

Gillette Co. v. Provost, 91 Mass. App. Ct. 133, 136 (2017) (same).

As we discuss below, the plaintiffs' amended complaint is based on three petitioning efforts by the defendants to block the plaintiffs' plans, including the defendants' appeals from the unfavorable results of each. After careful review, we discern no abuse of discretion or error of law in the judge's conclusion that the defendants' petitioning activity, in its entirety, "lacked any reasonable factual support or any arguable basis in law," Baker v. Parsons, 434 Mass. 543, 553-554 (2001), and that the defendants' special motion to dismiss was properly denied, see Blanchard II, 483 Mass. at 203 (appellate court reviews "ruling for an abuse of discretion or error of law"). Accordingly, we affirm.

Background. We summarize the facts drawn from the pleadings and the affidavits in the record before the judge. Benoit v. Frederickson, 454 Mass. 148, 149 (2009).

1. The parties. The plaintiffs are Bristol Asphalt Co., Inc. (Bristol Asphalt), and Edgewood Development Company, LLC (Edgewood) (collectively, Bristol parties). In 2019 Bristol Asphalt was established to assist Edgewood and other related entities in obtaining the necessary permits for the bituminous concrete plant (proposed plant) on behalf of the proposed plant's developer, Lorusso Corporation. Bristol Asphalt was

also incorporated to construct the permitted plant at a site located at 99 Kings Highway in Rochester (proposed site).

The defendants are Rochester Bituminous Products, Inc. (Rochester Bituminous), and Albert Todesca and Paul Todesca, individually and as trustees of the Todesca Realty Trust (Todesca Trust) (hereinafter, we refer to the defendants collectively as the RBP parties).[5]  Rochester Bituminous owns and operates an existing bituminous concrete production facility at 83 Kings Highway, the abutting parcel immediately south of the proposed site.  Previously, title to that property was held by the Todesca Trust, of which brothers Albert Todesca and Paul Todesca are the trustees.  Additionally, at different times Paul Todesca has served as a manager, officer, and director of Rochester Bituminous, while Albert Todesca has served as a "consultant."  Albert Todesca and Paul Todesca, as trustees, also owned two neighboring residential properties located on

---

[5] On appeal, the RBP parties argue that in considering their special motion to dismiss, we should separately consider each defendant's role and level of involvement in opposing the plans for the proposed plant.  Because none of the defendants raised this need for separate consideration below, that argument is waived.  See Trapp v. Roden, 473 Mass. 210, 220 n.12 (2015).  We note that nothing prevents the discrete defendants from availing themselves of further motions to dismiss or for summary judgment on grounds other than the anti-SLAPP statute as this case progresses, although we express no opinion on the likelihood of success of any such motion.

Kings Highway; neither property abutted the site of the proposed plant or was within 300 feet of it.

2. _The petitioning activity_. a. _Site plan approval_. The first category of petitioning activity addressed in the amended complaint concerns the RBP parties' challenges to the town planning board's approval of the site plan.[6]

The proposed site was located in the industrial district of the town. Under § IV(D)(1) of the town's zoning bylaws, as amended May 18, 2009, activities including "[m]anufacturing, industrial or commercial uses including processing, fabrication, assembly and storage of materials" were permitted by right in that district, provided that "no such use [was] permitted which would be detrimental or offensive or tend to reduce property values in the same or adjoining district." The bylaws required that all new development of the size and cost contemplated by the proposed plant be subject to site plan review and approval by the planning board. See Rochester Bylaws § XVI(1.1), as

---

[6] In his "corrected" affidavit submitted in support of the defendants' special motion to dismiss, Albert Todesca admitted that "we participated in the permit review process . . . [and] filed multiple . . . lawsuits and appeals" challenging the permitting for the proposed plant. In addition, the Todescas had an agreement with the abutters to the proposed site and other area residents whereby the Todesca Trust would fund all costs of the litigation opposing the site plan approval. The Todescas also admit that the Todesca Trust sponsored the citizen petitions discussed in part 2.c, _infra_.

amended June 9, 2003, and October 24, 2005.  In performing the required review for a use available as of right, the planning board's discretion was explicitly limited:  the bylaws provided that "[t]he Planning Board shall approve an application" if it found that the proposed development conformed with the bylaw, or if conformity could be achieved by compliance with "conditions, limitations and safeguards" imposed by the planning board.  See Rochester Bylaws § XVI(1.9)(3)(a), adopted February 27, 2002.  The planning board's discretion to deny approval of an as of right use was limited to, as relevant here, circumstances in which the plan "[was] so intrusive on the needs of the public in one regulated aspect or another that rejection by the [b]oard would be tenable because no form of reasonable conditions can be devised to satisfy the problem with the plan."  Rochester Bylaws § XVI(1.3)(3), as amended October 24, 2005.

Edgewood applied to the planning board for site plan approval for the facility in November 2010.  In May 2011, after nine public hearings on the application, the planning board approved the site plan.  In doing so, it concluded that the bituminous concrete plant was a use permitted as of right in the industrial district and that any defects in the plan as proposed could be remedied through the series of conditions the board imposed on, among other aspects of the project, the proposed

plant's compliance with State noise regulations and a traffic management plan.[7]

The Todesca Trust, through trustee Paul Todesca, and several abutters and other neighbors of the proposed site, including tenants of the Todesca Trust (abutters), appealed the planning board's approval of the site plan to the town's zoning board of appeal (ZBA). After a public hearing, the ZBA affirmed the planning board's decision. Pursuant to G. L. c. 40A, § 17, a subset of the abutters,[8] including both Todesca brothers, as trustees, appealed the ZBA's decision to the Land Court. A judge of that court granted partial summary judgment for Edgewood, rejecting the abutters' argument that the plant would generate noise levels so inherently "detrimental and offensive" as to take the plant out of the category of permitted uses under the zoning bylaws.

---

[7] The traffic-related conditions imposed by the planning board included a prohibition on truck parking on Kings Highway; installation of traffic signs; orientation of a driveway to accommodate increased traffic to the site; and distribution of rules for truck operation to all drivers, contractors, clients, and the planning board.

[8] Carol D'Acci, Michael D'Acci, Brandon Empey, Krystle Empey, Emma Galvin, Jeffrey Mason, Sean Somers, and Paul Murphy as trustee of the Willard Realty Trust. The named parties changed over the course of the litigation as tenants moved in and out of the residential properties near the proposed site.

Trial proceeded on the abutters' remaining claims, including that the proposed plant was a prohibited use under the zoning bylaws because the truck traffic and other harms associated with its operations would be "detrimental or offensive" and would tend to reduce the property values in the same or adjoining district; and alternatively, even if the proposed plant were a permitted use, that the request for approval of the site plan should be denied because "the [claimed] problem[s] [with the site plan] [were] so intractable that [they] could admit of no reasonable solution." Prudential Ins. Co. of Am. v. Board of Appeals of Westwood, 23 Mass. App. Ct. 278, 283 (1986).

The Land Court judge first rejected the abutters' challenge to the proposed plant's qualification as a permitted use on the grounds that "there is no evidence that [the] harms [on which the abutters' claims were based] are inherent in an asphalt plant use as opposed to any other industrial use." In doing so, the judge found no evidence that the proposed plant "would be appreciably different, or more intense in character, than any of the existing industrial uses," including the larger and more intense bituminous processing use by neighboring Rochester Bituminous. Next, the judge found no evidence from which she could find that the proposed plant would tend to reduce property values in the industrial district as a whole. She then

considered and rejected the abutters' claims that even considering the proposed plant as a permitted use, the ZBA erred in approving the site plan because the predicted problems were "intractable" and "admit[ted] of no reasonable solution." Prudential Ins. Co. of Am., 23 Mass. App. Ct. at 283.

Both sides introduced evidence about whether the proposed plant's operation created new safety risks or was likely to result in traffic congestion on the adjacent roadway. The judge noted, however, that the abutters' evidence -- their expert's testimony about the ability of trucks of a certain size to pass or travel abreast on the driveway of the proposed facility and the possibility that the "queuing" of waiting trucks could extend onto Kings Highway -- was based on "assumed facts provided by the Todescas and not on . . . proposed site conditions."[9] Concluding that (1) the risks predicted by that expert were hypothetical and unlikely to be realized, and (2) any actual traffic concerns could be adequately resolved through the imposition of the planning board's reasonable conditions,

---

[9] Although, as we will discuss, certain abutters appealed from the Land Court judgment upholding the planning board's decision, no appeal was pursued from this aspect of the judge's decision. See D'Acci v. Board of Appeals of Rochester, 91 Mass. App. Ct. 1118 (2017).

see note 7, supra, the Land Court judge rejected the abutters'

arguments[10] and, after trial, dismissed their appeal.

Three abutters funded by the Todesca Trust appealed the

Land Court judgment to this court.  On April 24, 2017, we

rejected their claims, agreed with the Land Court judge's

reasoning, and affirmed the judgment in an unpublished

memorandum and order pursuant to our rule 23.0.  See D'Acci v.

Board of Appeals of Rochester, 91 Mass. App. Ct. 1118 (2017).

In doing so, we concluded that the Land Court judge had

correctly granted summary judgment on the issue of noise where

the planning board's site approval was ultimately conditioned on

Edgewood's conformance with State noise regulations, as

evidenced by an air permit issued by the Department of

Environmental Protection (DEP).[11]  See id.  We also agreed with

---

[10] The Land Court judge's assessment of the likelihood that the risks predicted by the abutters' traffic expert would be realized relied on her weighing of conflicting evidence.  It does not appear, however, that the abutters introduced any evidence to show that if the traffic problems they predicted did come to pass, the conditions imposed by the planning board could not address them.  Although the abutters' expert opined that one of Edgewood's efforts to comply with those conditions -- its implementation of a "Temporary Truck Parking Plan" -- was "unworkable," there is no indication in the record that no "reasonable solution" was achievable.

[11] The planning board's conditions also required that to ensure compliance with the DEP regulations, Edgewood (1) provide the zoning enforcement officer and planning board weekly reports documenting ambient sound levels during the first sixty days of the proposed facility's operations; and (2) pay for the planning

the Land Court judge "that there [was] no evidence [that anticipated increased noise and truck traffic near the abutters' homes] [were] inherent to the [proposed] facility in particular, 'as opposed to any other industrial use,' and that the by-laws do not contemplate prohibiting an industrial use in an industrial district solely because a nearby residential property owner would find it offensive or detrimental." Id.  Finally, we agreed with the Land Court judge that the abutters had produced no evidence to show that the proposed facility would cause property values across the industrial district to decrease, and that the abutters' argument relied on an incorrect interpretation of the bylaws.  See id.

b.  Conservation commission.  The second category of petitioning activity engaged in by the RPB parties arose from Edgewood's request for an extension of an order of conditions issued by the town conservation commission (commission).

In December 2010, a month after it submitted its application for site plan approval, Edgewood filed, pursuant to the Wetlands Protection Act, G. L. c. 131, § 40, and the Rochester wetlands protection bylaw, a notice of intent with the commission.  The commission issued an order of conditions in March 2011, but due to delays in the site plan approval process

---

board's retention of a noise monitoring consultant to submit ongoing reports three times annually.

(resulting, at least in part, from the unsuccessful appeals of the planning board's decision), Edgewood was required to file for an extension of the order in January 2018.  It did so, and the commission granted Edgewood a three-year extension.

On June 26, 2018, Rochester Bituminous and three abutters (wetlands abutters) filed a certiorari action in the Superior Court challenging the extension.[12]  See G. L. c. 249, § 4.  The judge assigned to that case ruled against the wetlands abutters in July 2019, concluding that they had presented no evidence of any changes to the area that would require the rejection of or revisions to the original order of conditions, and nothing in the applicable statutes or regulations supported their arguments that either a new wetlands delineation or confirmation of the prior one was required.[13]  The wetlands abutters appealed from that judgment to this court; in 2020, we affirmed the judgment

_____

[12] The Bristol parties do not challenge the propriety of the wetlands abutters' attempt to seek review of the extension order in this manner, rather than through an appeal to the DEP.  See generally Healer v. Department of Envtl. Protection, 73 Mass. App. Ct. 714, 717-718 (2009) (discussing procedures for obtaining review of conservation commission orders). Accordingly, we do not address the propriety of their chosen path.

[13] The judge noted that the wetlands abutters could have appealed from the commission's order at the time it was issued but did not do so.  The judge also rejected several other arguments made by the wetlands abutters, none of which impacts our analysis and which we therefore do not explain in detail.

upholding the decision of the conservation commission to approve the extension order.[14]  See Rochester Bituminous Prods., Inc. v. Conservation Comm'n of Rochester, 98 Mass. App. Ct. 1118 (2020).

c.  MEPA petitions.  The final category of petitioning activity to which the amended complaint refers was connected to the RBP parties' efforts to obtain review of the proposed facility under the Massachusetts Environmental Policy Act, G. L. c. 30, §§ 61-62H (MEPA).  Although the proposed plant was not subject to such a review, the Todesca Trust nonetheless collected the signatures of twenty-one town residents and, through the trust's attorney, filed a citizen "fail-safe petition" in January 2018.[15]  The Executive Office of Energy and Environmental Affairs (EOEEA) issued an order in February 2018

---

[14] Contemporaneously with these proceedings, a group of twenty town residents appealed the extension order to DEP and from there to the Office of Appeals and Dispute Resolution (OADR).  The OADR concluded that nothing in the applicable law provided for an appeal to DEP and recommended that the DEP commissioner issue a final decision dismissing the appeal for failure to state a claim upon which relief could be granted. After the commissioner adopted the recommendation, Albert Todesca appealed the final decision to the Superior Court, but ultimately voluntarily dismissed that complaint.

[15] Under MEPA regulations, certain petitioners may seek a "fail-safe review" of a project that "does not meet or exceed any review thresholds" -- if specific requirements are met.  See 301 Code Mass. Regs. § 11.04(1) (2008).  The petition submitted by the Todesca Trust's attorney was based on the contention that "[e]xtensive construction in the area" in which the proposed plant was sited would "amplif[y] impacts to the surrounding wetlands and the watershed."

concluding that the petition did not meet the regulatory requirements for MEPA review. Undeterred, in January 2020, the Todesca Trust again recruited signatures and submitted, through its attorney, a second citizen petition in which it reiterated the same concerns on the same basis. The EOEEA denied the Todesca Trust's second fail-safe petition on the grounds that it alleged "virtually identical facts" to the 2018 petition.

3. The present action. On September 2, 2020, the Bristol parties filed a three-count amended complaint in the Superior Court alleging (1) unfair and deceptive acts and practices in the conduct of trade or commerce in violation of G. L. c. 93A, § 11; (2) conspiracy in restraint of trade or commerce in violation of G. L. c. 93, § 4; and (3) abuse of process.[16] In that complaint, the Bristol parties contended that the RBP parties' efforts to block the development of a new concrete plant were nothing more than attempts to eliminate competition for their own existing concrete production business, and that the RBP parties had repeatedly misused the petitioning process to accomplish that goal. The Bristol parties alleged that the RBP parties' challenges to its permitting efforts were "frivolous." They further alleged that as a result of the unnecessary litigation and resulting delays, they had suffered

---

[16] The original complaint was filed on August 17, 2020.

nearly $12 million in lost profits and had incurred hundreds of thousands of dollars in legal fees.

4. The special motion to dismiss. In response to the amended complaint, the RBP parties filed an answer and a special motion to dismiss pursuant to G. L. c. 231, § 59H. The RBP parties argued that all the conduct about which the Bristol parties complained was protected petitioning activity, and that each of the requests the RBP parties made for review of Edgewood's permit applications was reasonable and reflected their legitimate concerns about the proposed plant. Additionally, the RBP parties contended that the Bristol parties could not show that they had been injured by the RBP parties' petitioning activity.

After a hearing, the motion judge denied the RBP parties' special motion to dismiss. In a concise written decision, the motion judge correctly applied the analytical framework we discuss in detail below, concluding that, while the Bristol parties' claims were based solely on the RBP parties' petitioning activity, the Bristol parties had met their burden of demonstrating that the petitioning activity was a "sham" that caused injury to the Bristol parties, and that the RBP parties were therefore not entitled to the protections of G. L. c. 231, § 59H. This appeal followed.

Discussion. 1. Overview. "General Laws c. 231, § 59H, provides a procedural remedy -- the special motion to dismiss -- for early dismissal of SLAPP suits, i.e., 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" Nyberg v. Wheltle, 101 Mass. App. Ct. 639, 645 (2022), quoting Blanchard I, 477 Mass. at 147. "SLAPP suits have been characterized as 'generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.'" Nyberg, supra, quoting Duracraft, 427 Mass. at 161. In response to constitutional concerns and the difficulty of achieving the statute's legislative intent, see Blanchard I, supra at 143, the Supreme Judicial Court has built upon the analysis first laid out in Duracraft, supra at 167-168, for analyzing an anti-SLAPP special motion to dismiss. We pause briefly to review the requirements of this augmented Duracraft framework as it applies here.

To prevail on a special motion to dismiss under § 59H, the special movants (here, the RBP parties) "must make a threshold showing through pleadings and affidavits that the claims against it 'are "based on" the petitioning activities alone and have no substantial basis other than or in addition to the petitioning

activities.'" Fustolo v. Hollander, 455 Mass. 861, 865 (2010), quoting Duracraft, 427 Mass. at 167-168.

If the special movants (here, the RBP parties) make that "first stage" showing, the burden then shifts to the nonmovants (here, the Bristol parties) at the second stage of the analysis to defeat the special motion by meeting the requirements of one of two analytical paths that the judge must consider sequentially. See Nyberg, 101 Mass. App. Ct. at 646. The first path tracks the statutory language and requires a showing by the nonmovants (the Bristol parties) establishing "by a preponderance of the evidence that the [special movants (here, the RBP parties)] lacked any reasonable factual support or any arguable basis in law for [their] petitioning activity . . . and that the petitioning activity caused the nonmoving part[ies] 'actual injury' -- i.e., that [their] petitioning activity is illegitimate" (quotation and citation omitted). 477 Harrison Ave., LLC v. JACE Boston, LLC, 477 Mass. 162, 168 (2017) (Harrison I), S.C., 483 Mass. 514 (2019) (Harrison II). The judge does not consider the defendant's motivation for engaging in the petitioning activities; "[r]ather, the relevant inquiry is whether the plaintiff has demonstrated that the defendant's petitioning activity lack[ed] any objectively reasonable basis." Harrison I, supra at 173. "Proving that the moving party's petitioning activity was . . . a sham presents a 'high bar.'"

Blanchard II, 483 Mass. at 204, quoting Blanchard I, 477 Mass. at 156 n.20.

If, and only if, the nonmoving party fails to make the showing required under the first path of this second stage, the judge must then consider the nonmovant's showing under the second stage's second path announced in Blanchard I. If the judge reaches this level of the analysis, the nonmovants (here, the Bristol parties) are required "to establish, such that the motion judge can conclude with fair assurance, that [their] claim is not a 'meritless' SLAPP suit 'brought primarily to chill the special movant's . . . legitimate petitioning activities.'" Harrison II, 483 Mass. at 518-519, quoting Blanchard I, 477 Mass. at 160.

Here, the motion judge determined that the RBP parties met their burden at the first stage, successfully shifting the burden to the Bristol parties. He also concluded that the Bristol parties, as the nonmovants, prevailed at the second stage by proving by a preponderance of the evidence both that the RBP parties' petitioning lacked "any reasonable factual support or any arguable basis in law," Baker, 434 Mass. at 553-554, and that the Bristol parties had suffered resulting

injury.[17]  We consider de novo the RBP parties' showing at the

first stage, see Reichenbach v. Haydock, 92 Mass. App. Ct. 567,

572 (2017), but review for abuse of discretion or error of law

the motion judge's ruling concerning the Bristol parties'

showing at the second stage.  See Blanchard I, 477 Mass. at 160;

Nyberg, 101 Mass. App. Ct. at 646, citing Blanchard II, 483

Mass. at 203; Reichenbach, supra at 572 n.14; Gillette Co., 91

Mass. App. Ct. at 137.

2.  Judge's analysis.  a.  First stage.  The Bristol

parties do not dispute that their amended complaint was "'based

on' [the RBP parties'] petitioning activities alone and [had] no

substantial basis other than or in addition to [their]

petitioning activities."[18]  Reichenbach, 92 Mass. App. Ct. at

_____

[17] Having decided the motion based on the second stage,
first path, the motion judge properly did not reach the second
path of the second stage.

[18] We are unpersuaded by the Bristol parties' argument that
because Rochester Bituminous was a business competitor, and thus
engaging in petitioning activity of a kind different than that
which the anti-SLAPP statute was intended to protect, G. L.
c. 231, § 59H, should not apply.  Though "[t]he typical mischief
that the legislation intended to remedy was lawsuits directed at
individual citizens of modest means for speaking publicly
against development projects," Duracraft Corp., 427 Mass. at
161, the statute as enacted "[does] not address concerns over
its breadth and reach, and ignore[s] its potential uses in
litigation far different from the typical SLAPP suit."  Id. at
163.  Further, for purposes of the threshold determination, "[a]
special movant's motivation for engaging in petitioning activity
does not factor into whether it has met its threshold burden."
Harrison I, 477 Mass. at 168.

572, quoting Office One, Inc. v. Lopez, 437 Mass. 113, 122 (2002). We agree and conclude that the RBP parties met their threshold burden under the first stage of the augmented Duracraft framework.

b. Second stage. The burden shifted to the Bristol parties at the second stage. The motion judge correctly began with an assessment of the Bristol parties' showing under the first of the two second-stage paths and, concluding that they had demonstrated by a preponderance of the evidence that the RBP parties' conduct amounted to sham petitioning,[19] allowed the motion.[20] G. L. c. 231, § 59H. See Blanchard I, 477 Mass. at 159. Considering each of the three aspects of the RBP parties' petitioning activity, we discern no abuse of discretion or error in the motion judge's conclusion.

i. Site plan approval. A. Claims based on noise levels and decrease in property values. The RBP parties' noise-based challenge to Edgewood's site plan approval was based on evidence predicting that the proposed plant would raise noise levels at

---

[19] The motion judge concluded that the RBP parties' petitioning was "based on arguments that either conflicted with governing regulations or had no evidentiary support," and thus was not legitimate petitioning activity.

[20] On appeal, the defendants do not challenge the motion judge's determination that the plaintiffs suffered actual injury as a result of their petitioning. Accordingly, we need not discuss the Bristol parties' evidence of damages.

adjacent properties to thirty A-weighted decibels above the
ambient noise levels despite DEP regulations "limit[ing]
allowable increases to 10 [A-weighted decibels] above ambient."
See 310 Code Mass. Regs. § 7.10 (2002); Policy 90-001 (Jan. 16,
1990).  In making that argument, however, the RBP parties
ignored the fact that the planning board's approval of the site
plan was conditioned on the applicant's compliance with DEP-
promulgated noise regulations -- the very regulations on which
the RBP parties' argument relied.  See D'Acci, 91 Mass. App. Ct.
1118.  Where the Bristol parties could not permissibly operate
the plant unless they complied with those regulations, the RBP
parties' continuing noise-based objections to the site plan
approval lacked any reasonable legal basis or factual support.[21]

    We likewise see no error in the motion judge's rejection of
the RBP parties' argument that approval of the site plan
violated § IV(D)(1) of the bylaws, which excluded from as of

---

[21] The RBP parties contend that this argument nonetheless
had a legal basis because the Bristol parties had failed to show
actual compliance through the site plan submission.  This
argument verged on the frivolous; as the Land Court judge
reasoned, and we restated, a determination of actual compliance
could not be made until operations began.  See D'Acci, 91 Mass.
App. Ct. 1118.  Additionally, as the Land Court judge explained,
interpreting § IV(D)(1) of the bylaws to say that any industrial
use otherwise allowed in the industrial district is prohibited
if it has the potential for being "offensive" or "detrimental"
would confer broad (and arguably unfettered) veto powers on
adjacent property owners in a way that is not contemplated by
the bylaws.

right uses in the industrial district a use that "would . . .
tend to reduce property values in the same or adjoining
district." The RBP parties' evidence demonstrated, at best, a
potential decrease in the value of certain individual
properties, not, as the relevant bylaw required, a "tend[ency]
to reduce property values in the [industrial] or adjoining
districts" more generally. To the extent that the RBP parties
argued for a narrower interpretation of the bylaw, the motion
judge did not err in implicitly deferring to the planning
board's reasonable interpretation of its own bylaws, see Shirley
Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461
Mass. 469, 475 (2012).[22]

B. Claims based on traffic. We also discern no abuse of
discretion or other error in the motion judge's conclusion that
the RBP parties "lack[ed] a reasonable basis in fact or law" for
their claim that potential traffic issues required the denial of
the application for site plan approval. Blanchard I, 477 Mass.
at 159. As we concluded in D'Acci, and as the motion judge
noted in his decision on the special motion to dismiss, the RBP

---

[22] Indeed, as the motion judge noted, both we and the Land
Court judge had already done so. Additionally, both we and the
Land Court judge determined that the RBP parties had failed to
introduce evidence to show that the proposed plant would cause
property values across the industrial zone to decrease. See
D'Acci, 91 Mass. App. Ct. 1118.

parties did not present evidence at any stage to show that the Bristol parties' proposed bituminous concrete plant was any more detrimental or offensive than any other similar use, or that it was not a permitted use in the industrial district. See D'Acci, 91 Mass. App. Ct. 1118.

Considering the proposed plant as a permitted use, the planning board was limited by § XVI of the bylaws, adopted February 27, 2002, to imposing conditions in support of the objectives outlined there,[23] which it did. There was, in our view, no abuse of discretion in the motion judge's implicit conclusion that the conditions were reasonable and that additional site-specific conditions beyond those imposed by the board were not required. Since the proposed plant was a

_____

[23] Section XVI(1.4) of the bylaws, as amended and recodified October 25, 2005, sets forth a series of conditions including, as relevant here, design requirements intended to maximize "vehicular safety both on the site and egressing from it," "minimiz[ing] visual intrusion" from vehicles and glare, and "[c]onform[ance] with State and local sound regulations." Rochester Bylaws § XVI(1.4)(7), (9)-(10), (14). Section XVI(1.4) also provides that "Site Plan approval shall be granted upon determination by the Planning Board that the [enumerated] considerations have been reasonably addressed by the applicant. The Planning Board may impose reasonable conditions, at the expense of the applicant, to secure this result." Rochester Bylaws § XVI(1.4)(5). Section XVI (1.9)(3)(a) states, "The Planning Board shall approve an application if said Board finds that the proposed development is in conformance with this bylaw. In granting approval of an application, the Planning Board may impose conditions, limitations and safeguards which shall be in writing and which shall be a part of such approval."

permitted use in the industrial zone, under the relevant bylaws the question before the planning board (and on each successive review) was not whether there were potential problems with the site plan, but whether, as provided in § XVI(1.3)(3) of the bylaws, as amended October 24, 2005, "rejection . . . would be tenable because no form of reasonable conditions [could] be devised to satisfy the problem with the plan."

The RBP parties' particular traffic arguments required no site-specific conditions.[24]  The motion judge relied on our decision in D'Acci to conclude that "there was 'no evidence' the proposed plant would increase noise or truck traffic any more than any other use permitted in the industrial zoning district." See D'Acci, 91 Mass. App. Ct. 1118.  While true as far as it goes, this conclusion was part of our determination that the proposed facility was a permitted use; in D'Acci, we did not consider the traffic challenges the RBP parties raised, or whether additional conditions were needed to address them.  Id. We nonetheless conclude that because the record permitted the judge to reach the conclusion that he did, he was within his discretion in denying the special motion to dismiss.  See Gabbidon v. King, 414 Mass. 685, 686 (1993) (appellate court may affirm on "any ground apparent on the record that supports the

---

[24] See note 7, supra.

result reached in the lower court").  This is because it is apparent from the Land Court judge's decision that to the extent that the abutters introduced evidence supporting their traffic challenges, the evidence was grounded in assumed facts, rather than on what the dissent aptly terms "the idiosyncrasies" of the site plan, see post at .[25]

It is true that in the Land Court trial, the abutters' traffic expert testified, based on the proposed site plan, that the proposed plant's operation would result in traffic backups on the adjacent roadway, and that if more than six trucks were lined up on the driveway to pick up deliveries, any additional truck traffic would spill over onto the adjacent roadway.  As the Land Court judge noted, however, the expert's testimony depended on essential facts about which he had no personal knowledge, and which were provided to him by the "Todesca Plaintiffs."  Notably, the expert relied on the "Todesca Plaintiffs" for such critical facts as the dimensions of the trucks to be used at the site, the number of trucks that "actually process" through a facility and the time required to load each truck and to move it out of the queue of waiting vehicles, and the ability of the plant operators to regulate the

---

[25] We have reviewed the transcript of the Land Court trial, which was included in the record in D'Acci.  See D'Acci, 91 Mass. App. Ct. 1118.

timing of incoming truck traffic.  The fact that the Land Court judge engaged in a weighing of the evidence presented does not mean that the motion judge abused his discretion in concluding that, ultimately, the site plan challenge was a sham.  As the motion judge correctly recognized, to carry its burden at the second stage, first path, the Bristol parties' burden was to demonstrate that the RBP parties' claims lacked <u>reasonable</u> factual or legal support; the Bristol parties were not required to show that the RBP parties' claims lacked <u>any</u> support.  See <u>Baker</u>, 434 Mass. at 553-554.  Given the Land Court judge's assessment, the motion judge, in ruling on the RBP parties' special motion to dismiss, acted within his discretion to conclude, as he did, that although the "Todesca Plaintiffs" introduced evidence in support of their position, the evidence in question did not provide them with "a reasonable basis in fact or law" for their traffic claims.  <u>Blanchard I</u>, 477 Mass. at 159.  The bar at this stage of the analysis is "high," but the record here supports the judge's conclusion that the Bristol parties met it in this case.  <u>Blanchard II</u>, 483 Mass. at 204.

ii.  <u>Conservation commission</u>.  We discern no abuse of discretion or error in the motion judge's conclusion that the RBP parties' opposition to the commission's extension of the Bristol parties' order of conditions was "sham" petitioning. The RBP parties' argument that they had a good faith basis to

bring the opposition -- and to seek certiorari review in the Superior Court, and then to appeal to this court -- based on the mere passage of time between the commission's original order of conditions and Edgewood's January 2018 request for an extension lacked any basis in law or fact. See 310 Code Mass. Regs. § 10.05(8)(b) (2014) (identifying bases for denial of extension requests, including "where new information, not available at the time the Order [of Conditions] was issued, has become available and indicates that the Order is not adequate to protect the interests identified in G. L. c. 131, § 40"). On this record, not only did the RBP parties fail to introduce evidence at any stage of their petitioning of any "new information" or that "the [o]rder [was] not adequate to protect" the relevant statutory interests, id., but the only evidence that was presented on the subject indicated just the opposite -- that the wetlands at issue were unchanged from the time of the original order. As the motion judge noted, under these circumstances nothing in the applicable law or regulations required the commission to conduct a new wetlands delineation or to reevaluate the prior one.[26]

---

[26] The appeals to DEP and to the OADR were also without basis, as the governing statute and regulations do not provide for such an appeal. Cf. G. L. c. 131, § 40, nineteenth par.; 301 Code Mass. Regs. § 10.05(7)(b) (2014). The same is true for Albert Todesca's subsequent appeal to the Superior Court.

iii.  MEPA petition.  We similarly determine that there was
no abuse of discretion or other error in the motion judge's
conclusion that the MEPA petitioning was sham litigation.  Under
301 Code Mass. Regs. § 11.04(1) (2008), to invoke fail-safe
review, the petitioner must demonstrate three criteria:  (1)
"the Project is subject to MEPA jurisdiction"; (2) "the Project
has the potential to cause Damage to the Environment" either
unforeseeable when 301 Code Mass. Regs. §§ 11.00 was promulgated
or that "would be caused by a circumstance or combination of
circumstances that individually would not ordinarily cause
Damage to the Environment"; and (3) "requiring the filing of an
[environmental notification form[27]] and other compliance with
MEPA and 301 [Code of Mass. Regs. §§] 11.00 . . . is essential
to avoid or minimize Damage to the Environment; and . . . will
not result in an undue hardship for the Proponent."  Here,
neither petition satisfied more than the first condition.
Although the project was "subject to MEPA jurisdiction" as a
result of its need for an air quality plan approval by the DEP,
see 301 Code Mass. Regs. § 11.01(2)(a) (2013), there was no
evidence that it would cause the damage to the environment at
issue in the regulation, or that MEPA review was essential to

---

[27] An environmental notification form is an initial step in
obtaining MEPA review of a given project, and serves to "inform
the [EOEEA] Secretary of the nature of the project."  See Allen
v. Boston Redev. Auth., 450 Mass. 242, 246 (2007).

avoid or minimize potential environmental impacts of the proposed plant.  Accordingly, as EOEEA indicated in response to the first petition, and reiterated following the second one, there was no basis for MEPA intervention.

Conclusion.  The motion judge properly concluded the RBP parties' petitioning activity was "devoid of any reasonable factual support or any arguable basis in law."  G. L. c. 231, § 59H.  Because such "sham" petitioning is not entitled to the protections of § 59H, the judge did not err or abuse his discretion in denying the RBP parties' special motion to dismiss at the first path of the second stage of the augmented Duracraft analysis.  We affirm the motion judge's interlocutory order denying the RBP parties' special motion to dismiss the complaint against them and remand the case to the Superior Court for further proceedings.

So ordered.

RUBIN, J. (concurring).  I agree with and join the majority's opinion in its entirety.  Although I therefore do not believe we need reach the question to resolve this case, I write separately to express my disagreement with my learned dissenting colleague's assertion that, even in the absence of a statute like the anti-SLAPP statute, the Federal Constitution requires immunity from suit (what he calls "not be[ing] subject to suit"), post at , for redress against all abusive litigation that is not within the definition of "sham" as it has been articulated in the United States Court of Appeals for the Ninth and Tenth Circuit cases he cites construing the Noerr-Pennington doctrine of antitrust immunity for nonsham litigation[1] (which, I note, is in any event an immunity from liability, not suit). See United States v. Koziol, 993 F.3d 1160, 1171 (9th Cir. 2021), cert. denied, 142 S. Ct. 1372 (2022); CSMN Invs., LLC v. Cordillera Metro. Dist., 956 F.3d 1276, 1286 (10th Cir. 2020); Scott v. Hern, 216 F.3d 897, 915 (10th Cir. 2000).  For example, suits alleging the tort of abuse of process, themselves facially protected by the petition clause of the First Amendment to the United States Constitution, have long been held to have merit even in some cases where the defendant's abusive suit led to

---

[1] See United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961).

some recovery.  See, e.g., <u>Puerto Rico Tel. Co</u>. v. <u>San Juan Cable LLC</u>, 874 F.3d 767, 774 (1st Cir. 2018), cert. denied, 138 S. Ct. 1597 (2019) (Barron, J., concurring, with whom Torruella, J., joined) ("[T]he tort of abuse of process is itself sensitive to circumstance, but, presumably, the First Amendment is not infringed just because the tort imposes liability on some suits that have some merit").  See also <u>Poduska</u> v. <u>Ward</u>, 895 F.2d 854, 857 (1st Cir. 1990) (Aldrich, J.) (even fact that jury made small award to defendant as plaintiff in lawsuit does not preclude finding that suit was abuse of process); Restatement (Second) of Torts § 682 comment a (1977).[2]  This aspect of the tort obviously was not outlawed at the Federal level by the adoption in 1791 of the First Amendment, nor in Massachusetts by the adoption in 1868 of the Fourteenth Amendment to the United States Constitution.  Likewise, the relatively recent enactment of the anti-SLAPP statute in 1994, was not, as the dissent's analysis implies, unnecessary because, since 1868, one could get every suit to which it applies, and more, dismissed directly under the First and Fourteenth Amendments.

---

[2] Although the dissent implies otherwise, see <u>post</u> at , I know of no authority holding that the clauses of the First Amendment prohibiting laws "abridging the freedom of speech," which says nothing about the motive of the speaker, and laws "abridging . . . the right . . . to petition the Government <u>for a redress of grievances</u>" (emphasis added) are coextensive, or that the analysis under them is identical.

I also therefore disagree with my dissenting colleague's conclusion that the Supreme Judicial Court's second path of the second stage holding in Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141, 160 (2017), S.C., 483 Mass. 200 (2019), by which we are bound, that a plaintiff can defeat a special motion to dismiss and proceed with suit if that plaintiff can "demonstrat[e] that [the challenged] claim was not primarily brought to chill the special movant's legitimate petitioning activities," violates the petition clause of the First Amendment.

ENGLANDER, J. (dissenting in part).  Application of the anti-SLAPP act, G. L. c. 231, § 59H, in this context requires judges to navigate between two basic principles:  on the one hand, the people have the fundamental right to petition the government for redress of grievances -- and this petition right sometimes includes, as in this case, the right to sue the government to compel it to comply with its own rules for conducting its business.  On the other hand, parties should be held responsible if they make a claim before an adjudicative body that has no reasonable basis in fact or law, including answering for any damages they may cause.  Here the majority sweepingly concludes (as did the motion judge) that all of the defendant RBP parties' prior contentions made to the government boards and agencies were without reasonable basis in fact or law, and thus actionable.  The Federal Constitution (and the anti-SLAPP case law) requires a more discerning look, however, and in my view, one of the claims that the RBP parties previously asserted cannot properly be considered a "sham," and accordingly, cannot be subject to suit.  See Kobrin v. Gastfriend, 443 Mass. 327, 333 (2005) ("the right of petition protected in the anti-SLAPP statute is that right enumerated in the First Amendment to the United States Constitution").

To be clear, I agree with the majority that many of the claims that the RBP parties previously asserted to government

bodies -- including all claims that the RBP parties asserted based upon actions of the town of Rochester (town) conservation commission and the Executive Office of Energy and Environmental Affairs -- were entirely without basis and thus a "sham."  But not all of the RBP parties' prior claims met that test.  In particular, the RBP parties' Land Court challenge to the planning board's site plan approval raised material concerns about how truck traffic would infringe on the public way abutting the site, which concerns were backed by reasonable, fact-based expert testimony.  In bringing suit to present such legitimate concerns, the RBP parties were exercising their constitutional right to petition the government for redress.[1] See Real Estate Bar Ass'n for Mass., Inc. v. National Real Estate Info. Servs., 608 F.3d 110, 124 (1st Cir. 2010).  The RBP parties cannot be subject to government sanction for that exercise, and the anti-SLAPP statute cannot be construed to allow same.  See CSMN Invs., LLC v. Cordillera Metro. Dist., 956 F.3d 1276, 1282 (10th Cir. 2020) ("Immunity flows from this right, protecting those who seek redress through the courts from

---

[1] I do not mean to suggest that the petition clause of the First Amendment (petition clause) provides the RBP parties a constitutional right to sue the government over their neighbor's land use.  It does not.  But whereas here the Commonwealth has provided that right by statute (and, to that extent, waived any governmental immunity), the RBP parties' exercise of the right was protected petitioning activity.

liability for petitioning activities").  Insofar as the

plaintiff Bristol parties' suit claims that the RBP parties

violated the law (e.g., G. L. c. 93A) by pursuing these traffic

issues, that portion of the Bristol parties' claims was required

to be dismissed.[2]

My quarrel with the majority is narrow, but important.

While I agree that most of the claims and arguments that the

RBP parties advanced in opposing the proposed development were

without basis in fact or law, the majority also would allow the

Bristol parties to pursue damages from the RBP parties for their

assertion of a claim that was <u>not</u> "without basis."  There are

several points to be made about why such a result cannot be

allowed.

First, we should pause for a moment to recognize that it

should be the unusual case where a court concludes, as the judge

did here, that a party's prior efforts to petition the

government were without reasonable basis.  Labeling petitioning

---

[2] As others have already observed, the case law construing the anti-SLAPP statute is remarkably complex, and in need of simplification.  See <u>Commonwealth</u> v. <u>Exxon Mobil Corp</u>., 489 Mass. 724, 728 n.5 (2022) (recognizing anti-SLAPP "case law may require further reconsideration and simplification"); <u>Nyberg</u> v. <u>Wheltle</u>, 101 Mass. App. Ct. 639, 656-658 (2022) (discussing "concerns" regarding anti-SLAPP case law).  As I discuss <u>infra</u>, one such simplification would be to do away entirely with the "second path of the second stage" analysis, since that analysis cannot be squared with the protections afforded by the petition clause of the United States Constitution.

activity a "sham" cannot be undertaken lightly. As the majority notes, proving that particular petitioning activity is "a sham presents a 'high bar'" (citation omitted). Blanchard v. Steward Carney Hospital, Inc., 483 Mass. 200, 204 (2019) (Blanchard II). And for good reason, because if petitioning activity can be too easily subjected to suit, we will end up chilling the very activity that the anti-SLAPP statute (and the petition clause) were designed to protect.

Second, the standard for establishing "sham" petitioning was not met here with respect to the RBP parties' previous claim that the Bristol parties' proposed use might result in "detrimental or offensive" traffic impacts on an abutting highway. As indicated, the sham petitioning standard requires the Bristol parties to show that the petitioning activity they seek to sanction was "devoid of any reasonable factual support or any arguable basis in law."[3] G. L. c. 231, § 59H. The test is objective; it does not turn or depend upon the motivations of the petitioner. See 477 Harrison Ave., LLC v. JACE Boston, LLC, 477 Mass. 162, 173 (2017), S.C., 483 Mass. 514 (2019) ("motivation for engaging in petitioning activity" irrelevant to

---

[3] The standard is found in the language of the anti-SLAPP statute itself, but it also derives directly from the petition clause. See CSMN Invs., LLC, 956 F.3d at 1283, 1286 (first step of "sham-petitioning test" asking "whether the petitioning has an objectively reasonable basis . . . determin[es] whether conduct . . . loses [p]etition [c]lause immunity").

whether such activity "lacks an objectively reasonable basis"). See also CSMN Invs., LLC, 956 F.3d at 1286 (holding that petitioning activity may not be subject to suit unless, as a first step, petitioning is objectively unreasonable).

The petitioning activity I wish to focus on here was the RBP parties' challenge to the planning board's site plan approval.  The RBP parties filed suit in the Land Court, as provided by statute.  See G. L. c. 40A, § 17.  One of the grounds they argued was that as designed and operated, the proposed site would result in traffic backing up onto Kings Highway, the public way from which the site would be accessed. The RBP parties presented an expert traffic engineer; he pointed out that the access road into and out of the plant was designed narrowly -- eighteen feet wide, barely enough for two trucks to pass in opposite directions.  The expert also calculated that if more than six trucks were waiting to pick up finished product on site, the waiting trucks would necessarily spill out onto Kings Highway, choking traffic on that road.  The RBP parties accordingly contended that the site plan should not have been approved, because it violated the town bylaw requiring that a proposed use not be "detrimental or offensive."

For their part, the Bristol parties did not take issue with their obligation to meet the not "detrimental or offensive" legal standard under the town bylaws.  Nor did the Bristol

parties challenge the RBP parties' expert's calculations or observations as to how many trucks could be queued on site at one time.  Rather, the Bristol parties argued that the scenario painted by the RBP parties' expert was unlikely to occur.  For one thing, the Bristol parties pointed out that one of the conditions of site plan approval required "no parking" signs to be placed on Kings Highway.  But the Bristol parties' principal contention was a practical one:  they contended that most of the trucks bringing raw material would be from their own or related companies, and those trucks could be instructed not to come to the site if backups were occurring.  After hearing this evidence, the Land Court judge sided with the Bristol parties, but in measured words:

> "On balance, I am not persuaded that [the] site plan . . . will result in the vehicular safety issues hypothesized by [the RBP parties' expert], except in unusual circumstances. Even if such unusual circumstances were to arise, I credit [the Bristol parties' expert's] testimony that [the Bristol parties] ha[ve] the capacity to control the majority of the trucks visiting the [proposed site] and therefore could direct trucks away from the site if the hypothetical events posited by [the RBP parties' expert] were to occur."

It was incorrect to conclude, on the above record, that this aspect of the RBP parties' claims was a "sham."  The RBP parties' claim was based in fact (the idiosyncrasies of the proposed site plan, including the proximity to Kings Highway and the narrowness of the interior roads), and supported by reasonable expert testimony.  The RBP parties brought an

appropriate legal claim, based upon the standard of a town bylaw.  Notably, the trial judge did not suggest the claim was without basis, ruling against it only after considering the arguments "on balance."  A losing claim is not automatically a "sham."  See Wenger v. Aceto, 451 Mass. 1, 7 (2008) ("The critical determination is not whether the petitioning activity in question will be successful, but whether it contains any reasonable factual or legal merit at all"); Donovan v. Gardner, 50 Mass. App. Ct. 595, 601 (2000) ("That [defendants] were unsuccessful does not, in and of itself, mean that their [petitioning activity] did not have some basis in law or foundation in fact").

In short, this particular aspect of the RBP parties' arguments raised reasonable concerns to a government body, which the RBP parties were entitled to raise.  The majority attempts to paint these concerns as "hypothetical," ante at    , but that is a mere label, which does not meet the substance of the RBP parties' contentions.  True, the RBP parties' expert testimony necessarily was hypothetical, in that the expert was addressing what would happen in the future, when the plant was completed and operating.  His analysis was not rooted in fantasy, however, but in a facially reasonable assumption that from time to time, more than six trucks would be queued to pick up finished product.  Notably, there was no planning board condition that

would prevent this; there was no condition, for example, requiring the Bristol parties only to work with trucks from their own companies. And as the RBP parties' expert pointed out in his testimony, "no parking" signs might well be ineffective in preventing trucks from spilling out onto the highway, engines running (and thus arguably not "parked"), when there was insufficient room for them on site. Much more was required to demonstrate sham petitioning.[4]

Third, I disagree with the majority that we review the motion judge's denial of the special motion to dismiss only for "abuse of discretion." The question whether particular petitioning activity was without reasonable basis must be

-----

[4] These traffic issues were not previously addressed by this court. They were not raised in the appeal from the Land Court judgment.

The RBP parties' traffic arguments can be contrasted with their contentions, also made to the planning board on site plan review, that the proposed plant would violate the Department of Environmental Protection (DEP) noise regulations. The RBP parties pursued this noise argument, even though the planning board expressly conditioned its site plan approval on the plant's compliance with DEP noise regulations. And the RBP parties thereafter pursued this noise argument to the town zoning board of appeals, to the Land Court, and to this court, at which point we noted that the planning board's conditions were reasonable, because "[i]n order to begin operations, [the plant operator] would have to apply for an air permit from DEP, which would only approve the permit if it found the [proposed] facility to be in conformance with State noise regulations." The RBP parties' pursuit of the noise argument in connection with the planning board's site plan approval thus had no reasonable basis in law.

treated as a question of law, subject to de novo review.  The

reason for this, most importantly, is that fundamental First

Amendment rights are at stake; the RBP parties had a right to

bring their Land Court suit, and they cannot be subject to State

sanction (e.g., in damages) for bringing it, unless it was

without basis in fact or law.  See Scott v. Hern, 216 F.3d 897,

914-915 (10th Cir. 2000) (collecting cases; "petitioning

activities" are protected "from liability under the First

Amendment" unless, among other things, plaintiff shows "the

defendant's [prior] claims were devoid of reasonable factual

support" or "lacked any cognizable basis in law" [citation

omitted]).[5]  Under First Amendment case law, judges commonly are

---

[5] Citing authority addressing the tort of abuse of process, Justice Rubin's concurrence suggests that a party may be held liable for prosecuting an action that had an objectively reasonable basis, if the party had a subjectively improper motive for doing so.  Stated broadly, the position the concurrence advances cannot be squared with the petition clause or the precedent I cite above (which, I note, is explicitly not limited to the antitrust context, but has been applied to a panoply of torts).  See CSMN Invs., LLC, 956 F.3d at 1283.  I note that the United States Court of Appeals for the First Circuit also has recognized the "long standing" First Amendment "right to file lawsuits that are not baseless."  Real Estate Bar Ass'n for Mass., Inc., 608 F.3d at 124.

Indeed, I am aware of no context in which conduct objectively protected by the First Amendment nevertheless can be sanctioned, because the government (i.e., the courts) concludes that it does not like the subjective motivation behind the petitioning/speech.  Accordingly, while I acknowledge a tension between some abuse of process authority and the above petition clause case law, that tension is resolved by requiring abuse of process plaintiffs to show that the action they are challenging

called upon to exercise de novo review when State judicial process is invoked to sanction conduct that may be protected. See, e.g., Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984) ("whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact," but is instead subject to de novo review).  See also United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Novartis Pharms. Corp., 902 F.3d 1, 14 (1st Cir. 2018) ("review of whether the plaintiffs have plausibly alleged 'sham' litigation is de novo").  Moreover, whether the plaintiffs have shown that the defendants' petitioning activity was "without reasonable basis in fact or law" is a question of law that this court is equally able to evaluate, based upon the trial court record.[6]  Where the prior petitioning activity was reasonably based, our standard of

was objectively without basis.  See Protect Our Mountain Env't, Inc. v. District Court, 677 P.2d 1361, 1369 (Colo. 1984).

[6] This is certainly the case where, as here, the factual and legal basis for the prior petitioning activity is evident from the petitioning activity itself.  As the statute contemplates, there may be circumstances where the court takes additional evidence on such subjects, but in the vast majority of cases the judge's ruling will be on a paper record.  See Kitras v. Aquinnah, 474 Mass. 132, 138, cert. denied, 580 U.S. 1000 (2016) ("no special deference is shown" where findings are premised "on documentary materials").

review should not afford the motion judge "discretion" to deny the anti-SLAPP special motion to dismiss, thereby allowing a case to go forward that is prohibited under the First Amendment.

The cases the majority cites for applying an abuse of discretion standard -- in particular, Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141 (2017) (Blanchard I), S.C., 483 Mass. 200 (2019) (Blanchard II) -- do not require a contrary result. In Blanchard I, the Supreme Judicial Court announced an alternative means by which plaintiffs can defeat special motions to dismiss -- the complexly labelled "second path" of the "second stage" of the anti-SLAPP analysis. Blanchard II, 483 Mass. at 204-205. In Blanchard I, the Supreme Judicial Court explained that this new, second path analysis should be applied by "the motion judge, in the exercise of sound discretion, . . . assess[ing] the totality of the circumstances pertinent to the nonmoving party's asserted primary purpose in bringing its claim." Id. at 160. That language, however, related to the alternative path that the Supreme Judicial Court had just announced; it does not set the standard to apply when reviewing whether a special motion to dismiss can be avoided by showing that the challenged petitioning activity lacked a reasonable basis.[7]

_____

[7] While there are several other anti-SLAPP cases that describe the standard of review as "abuse of discretion or other

Fourth, the decision below, which denied the motion to dismiss in its entirety, cannot be justified on a theory that most of the defendants' petitioning activity was, in fact, a sham. The anti-SLAPP case law requires a more careful and discerning analysis. The Supreme Judicial Court's decision in Blanchard I made this clear, where the court separately addressed two components of the plaintiffs' libel claim, holding that one survived the anti-SLAPP statute, while one might not. See Blanchard I, 477 Mass. at 150-153. As we noted in Haverhill Stem LLC v. Jennings, 99 Mass. App. Ct. 626, 634 (2021), when applying the anti-SLAPP statute, "the allegations need to be carefully parsed even within a single count." Accordingly, while the anti-SLAPP motion was properly denied as to many of the bases of the Bristol parties' claims, the motion had to be granted as to claimed damages arising out of the traffic

---

error of law," (emphasis added), Kobrin, 443 Mass. at 330-331, I do not view those cases as inconsistent with the de novo standard I espouse here. See Marabello v. Boston Bark Corp., 463 Mass. 394, 397 (2012); Cadle Co. v. Schlichtmann, 448 Mass. 242, 250 (2007). In Wenger, for example, the Supreme Judicial Court clearly applied a de novo standard of review in holding, as a matter of law, that two counts of a plaintiff's complaint must be dismissed under the anti-SLAPP statute, because the defendant's prior petitioning activity had a reasonable basis in fact and law. See Wenger, 451 Mass. at 7. But see Gillette Co. v. Provost, 91 Mass. App. Ct. 133, 137-140 (2017) (arguably applying abuse of discretion standard only).

contentions highlighted above.[8]  The First Amendment precludes the Bristol parties from recovering for that conduct.  See CSMN Invs., LLC, 956 F.3d at 1286 (petition clause immunizes objectively reasonable claims).  See also United States v. Koziol, 993 F.3d 1160, 1171 (9th Cir. 2021), cert. denied, 142 S. Ct. 1372 (2022) ("constitutional right to petition" "immunize[s] from statutory liability" "most litigation activities" not constituting a "sham").

Fifth and finally, I need to go on to address the "second path of the second stage" of the anti-SLAPP analysis.  Why this is necessary is not simple to describe, but I will give it a try:  (1) if (as here) the plaintiffs' (Bristol parties') claim is based solely on the defendants' (RBP parties') prior

---

[8] I acknowledge that it will not always be easy to separate protected petitioning activity from unprotected conduct, where both are the subject of the allegations of a single count.  This issue has previously arisen when applying the first path of anti-SLAPP analysis -- that is, whether the plaintiff's claim is based "solely" on petitioning activity.  Sometimes, as with the G. L. c. 93A claim in Haverhill Stem LLC, the allegations of petitioning and nonpetitioning activity in a single count are so interrelated that the entire count must be allowed to go forward, while recognizing that those allegations that challenge protected petitioning activity cannot be the basis for an ultimate recovery.  See Haverhill Stem LLC, 99 Mass. App. Ct. at 633-634.  On the other hand, in Blanchard I, the two types of allegedly libelous statements could be separately addressed, with one type being deemed petitioning activity and thus (potentially) dismissible.  See Blanchard I, 477 Mass. at 161. Here, as in Blanchard I, the defendants' traffic contentions in the Land Court are sufficiently separable and distinct that suit based upon that objectively reasonable petitioning activity should have been dismissed at this stage.

petitioning activity, then the first stage is satisfied, and the anti-SLAPP statute applies to bar the claim, unless (2) the petitioning activity sued upon is a sham (under the second stage, first path), in which case the anti-SLAPP statute does not apply to bar the claim and the case can go forward.

So far, so good. But as noted, in Blanchard I the Supreme Judicial Court set forth the alternative "second path." See Blanchard I, 477 Mass. at 160. Under that alternative, even if a lawsuit seeks to sanction petitioning activity and the petitioning activity had a reasonable basis (i.e., was not a sham), dismissal under the anti-SLAPP statute can still be avoided on the plaintiffs' showing that its lawsuit was not "primarily brought to chill" the defendants' prior assertions of their petitioning rights. See id. In Blanchard I, the Supreme Judicial Court reasoned that this second path was required to further mitigate "the possibility" that defendants "may . . . use the [anti-SLAPP] special motion [to dismiss] to eradicate [plaintiffs'] . . . claim[s]," even where the plaintiffs' claims are not "primarily geared toward chilling [legitimate] petitioning" -- thus (arguably) chilling the plaintiffs' own petitioning rights in the process. Id. at 157.

Because I have concluded that a portion of the RBP parties' prior petitioning activities was not a sham, under Blanchard I and its progeny I would need to analyze this second path. But

in my view, such an analysis is unnecessary, and indeed, constitutionally inappropriate.  As discussed above, the defendants' traffic contentions were (1) petitioning activity, and (2) not a sham.  Under the United States Constitution, this has to be the end of the analysis.  The arguments were protected under the First Amendment's petition clause, and as a result, could not be the basis for a State law damages claim.  See CSMN Invs., LLC, 956 F.3d at 1286-1288 (District Court properly dismissed suit seeking to sanction State-based claims that were objectively reasonable).  See also Scott, 216 F.3d at 914-915.  The plaintiffs' claims based upon those arguments must be dismissed, as must any such claims based on protected petitioning activity.[9]

To the extent described above, I dissent from the majority's opinion affirming the denial of the motion to dismiss.

---

[9] It should not be a controversial proposition that the protections provided under the anti-SLAPP statute equal (at least) those under the First Amendment.  The statute's text expressly protects a "party's exercise of its right of petition under the constitution of the United States," which it defines in part as "any . . . statement falling within constitutional protection of the right to petition government."  See G. L. c. 231, § 59H.  Accordingly, at least in the context of the claim at issue here, the "second path of the second stage" cannot be applied because it could allow a claim to go forward where the claim violates the petition clause.  It may well be that anti-SLAPP analysis can be simplified by eliminating this second path.